UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

GLEN POLLARD,

    Defendant.

Case No. 3:20-cr-33

District Judge Michael J. Newman

---

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS (Doc. No. 18)**

---

Defendant Glen Pollard ("Pollard") is charged in a single-count indictment with knowing and intentional possession of cocaine with intent to distribute. Doc. No. 12. Pollard moves to suppress (Doc. No. 18) the evidence obtained after the police conducted a warrantless search of his car, and the parties have filed respective memoranda in support of, and in response to, this motion (Doc. Nos. 49, 53, 54). On April 5 and 6, 2022, the Court held a suppression hearing. *See* Doc. Nos. 47, 48. The Court heard testimony from Trooper Steve Duteil, of the Ohio State Highway Patrol; Trooper Jason Barhorst, a K9 officer with the Ohio State Highway Patrol; and Jerry Potter, an expert retained by Defendant to testify about the accuracy of Roy, the dog Trooper Barhorst used to sniff Pollard's car. The parties also presented video from two cameras located in Trooper Duteil's cruiser: one camera on the dashboard and one in the rear passenger compartment. *See* Def's Exh. E; Gov't's Exh. 1-A.[1]  During the hearing, the Court accepted the parties' exhibits

---

[1] Citations to exhibits shall be abbreviated as follows: (1) Def's Exh.; and (2) Gov't's Exh.

into evidence. Doc. No. 48 at PageID 468–69.² The motion is now ripe for review. For the reasons that follow, Pollard's motion is denied.

I.

**A. The Traffic Stop and Free Air Sniff**

During the suppression hearing, it was established that Pollard drove his white Cadillac on Interstate 75 in Warren County, Ohio on February 18, 2020. Doc. No. 47 at PageID 172. As he would later tell Trooper Duteil, Pollard was apparently driving from Chicago to Ohio to visit friends. *See* Def's Exh. E at 16:56:14–:59:20.

Unbeknownst to Pollard, Trooper Duteil was on the lookout for him as he then drove on Interstate 75. Doc. No. 47 at PageID 189, 212. A confidential informant had warned Department of Homeland Security investigators that morning that Pollard was driving "with a cocaine load and possibly staying at a hotel in the greater Cincinnati area." Def's Exh. B. (Ohio Attorney General's Report); Def's Exh. C. That same morning, agents spotted Pollard exit his hotel room in Mason, Ohio, place a shoebox in his trunk, and drive onto the highway. *Id.*; Doc. No. 47 at PageID 290–91. Trooper Duteil testified that his superiors (after relaying this information) told him to follow Pollard, wait until he violated a traffic law, and pull him over. Doc. No. 47 at PageID 189–90, 212.

Video from Trooper Duteil's dashboard camera partially depicted Trooper Duteil's field of view as he allegedly followed Pollard's Cadillac. *See* Def's Exh. E. The Cadillac appeared out of range until a few minutes into the footage. *See, e.g., id.* at 16:50:41–:56. Trooper Duteil

---

² However, defense counsel noted on the record that they would not admit Defendant's Exhibit H into evidence, stating it was merely "demonstrative." Doc. No. 48 at PageID 470. The Court addresses the utility of this video in footnote 6. *See infra* § III, n.6.

2

testified that he saw Pollard commit two traffic infractions: (1) traveling seventy-two-mph in a sixty-five-mph zone; and (2) a marked lane violation. Doc. No. 47 at PageID 181–83.

As Pollard travelled, Trooper Duteil testified that he "paced" the Cadillac. *Id.* at PageID 181. "Pacing" is where a police officer travels approximately the same speed as a car that is allegedly traveling above the speed limit. *Id.* Trooper Duteil also testified that, based on his calibrated, accurate speedometer, Pollard traveled seventy-two-mph for at least five seconds. *Id.* at PageID 181, 216; Def's Exh. E at 16:50:47–:56.

The alleged marked lane violation occurs outside of the view of the dashboard camera. Nonetheless, Trooper Duteil testified that he observed Pollard's car drift approximately one foot over the lane line before he "paced" Pollard's car. Doc. No. 47 at PageID 182–83, 236.

Trooper Duteil eventually pulled behind Pollard's car and activated his lights, prompting Pollard to pull over to the right side of the highway. Doc. No. 47 at PageID 184–89; Def's Exh. E at 16:51:48–16:52:59. The video reveals, and Trooper Duteil testified, that before he exited his vehicle, Pollard sprung out of the Cadillac and ran to its side. Doc. No. 47 at PageID 190–91; Def's Exh. E at 16:52:59–:54:01. Trooper Duteil then exited his vehicle and cautiously approached Pollard, who stood beside the Cadillac with his hands in his pockets. Def's Exh. E at 16:54:01–:38.

A brief exchange between both men ensued. *Id.* at 16:54:38–:55:15. The video camera did not clearly record what precisely was said due to the noisy highway. But Trooper Duteil testified—without objection—that during their conversation, they talked about why Duteil pulled Pollard over, whether Pollard had any weapons on him, and how Pollard admitted to carrying a pocketknife. Doc. No. 47 at PageID 193–95. Pollard's admission prompted Trooper Duteil to pat him down, and Duteil testified that he felt a pill bottle in Pollard's pocket. *Id.* at PageID 196.

3

After Duteil felt the pill bottle, he did not search Pollard's pocket, and Pollard kept the pill bottle in his pocket at that time. *Id.* at PageID 196–97.

Trooper Duteil asked Pollard if he would willingly continue their conversation inside his cruiser. *Id.* at PageID 195. Pollard agreed and sat in the rear of the cruiser, although Duteil noted in his report that Pollard was "overly nervous and defensive in nature." *Id.*; Def's Exh. A.[3]

Trooper Duteil sat in the driver's seat and chatted with Pollard until Trooper Barhorst arrived with Roy. Def's Exh. E at 16:56:14–:59:20. Duteil and Pollard chatted about Pollard's travel, and Pollard admitted he had been speeding. *Id.* Meanwhile, Barhorst led Roy to the left side of the Cadillac. *Id.* at 16:59:20–:24. Roy sniffed near the front of the Cadillac, returned to the rear left tire, and signaled once by scratching the side of the Cadillac. *Id.* at 16:59:24–:48. After Barhorst did not immediately reward Roy, he sniffed the same area and scratched again. *Id.* at 16:59:48–17:00:04. Police searched the trunk and found the shoebox full of cocaine. *See* Def's Exh. I (police report describing the packages in the shoebox seized from the Cadillac's trunk).[4]

### B. Roy's Training

Trooper Barhorst testified at the hearing about Roy's training and the certification Roy received as a drug-sniffing dog with the Ohio Police Officers Training Academy ("OPOTA").

---

[3] Video footage from the cruiser's interior revealed that Pollard surreptitiously took the pill bottle—that Duteil later testified was full of marijuana—from his coat and shoved it under the seat in front of him. Doc. No. 47 at PageID 199–202; Gov't's Exh. 1-A at 17:00:49. Because this occurred after Trooper Barhorst deployed Roy to sniff the car, it is irrelevant to the issues presented in this case. *See infra*, § III. *Compare* Def's Exh. E at 16:59:24–17:00:04 (showing Roy's sniff), *with* Gov't's Exh. 1-A at 17:00:49 *and* Doc. No. 47 at PageID 204–06 (showing Barhorst's reaction to discovering the pill bottle in the back of the cruiser after conducting the sniff).

[4] The police also searched Pollard's hotel room under an Ohio Organized Crime Criminal Subpoena, which was based, in part, on the cocaine found in his trunk. *See* Doc. No. 1 at PageID 4–5. Although Pollard challenged this search in his original motion in a conclusory manner, his post-hearing brief only challenges the search of the Cadillac and not the search of his hotel room. *See* Doc. Nos. 12, 49. Nor does Pollard renew his previous conclusory attempt to suppress statements he made to the police. Challenges like these "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Engler v. Arnold*, 862 F.3d 571, 577 (6th Cir. 2017) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)).

Doc. No. 47 at PageID 247–50.  Barhorst worked with Roy (and Roy alone) in the program for eight years.  *Id.* at PageID 247.  Before Roy and Barhorst could work together, they had to complete a six-week training program through the Ohio State Highway Patrol ("OSHP").  *Id.* at PageID 248–49.  This program tested Roy's proficiency in smell-detecting narcotics, including cocaine.  *Id.* at PageID 252.  After completing the program, Roy and Barhorst received their certification, which was valid when Roy sniffed Pollard's Cadillac.  *Id.* at PageID 251, 252; *see* Gov't's Exh. 3 (OPOTA certification).

Roy was an aggressive alert canine—one who scratches to alert.  Doc. No. 47 at PageID 253–54.  Barhorst testified that he trained Roy with positive reinforcement, *i.e.*, Roy receives any combination of verbal praise, physical praise, or play with or without his toy when he sniffs.  *Id.* at PageID 319–20.  If Roy did not alert after sniffing when there were no hidden narcotics for him to detect, Roy still received positive reinforcement.  *Id.* at PageID 320–21.

The OSHP's canine handler training manual required Barhorst and Roy to complete sixteen hours of training per month.  Doc. No. 47 at PageID 256–57; Def's Exh. F at 8 (OSHP canine handler's training manual).  Trooper Barhorst testified that these training hours entail setting up exercises for Roy to find various hidden narcotics.  Doc. No. 47 at PageID 258.  For instance, in one scenario, Roy detected cocaine hidden in a parked pick-up truck, a commercial semi-truck, and parked cars.  *See* Def's Exh. G at 069, 078, 108.  In another, Roy did not alert when there were no narcotics to detect and avoided alerting on multiple substances placed as distractions throughout the training area.  *Id.* at 063, 070; Doc. No. 47 at PageID 258–59.  Training reports, admitted into evidence during the suppression hearing, showed how long it took to run the training exercises, when Roy and Barhorst completed the training exercises, and what occurred during each training session.  *See* Def's Exh. G.

5

Roy and Barhorst's supervisor signed off on reports verifying they completed their sixteen-hour training requirement for the month prior to the sniff at issue here, as well as every other month. Doc. No. 47 at PageID 260, 261–62, 336–37. Remarkably, in the month prior, Roy found every hidden lure without a single false indication—even in scenarios with multiple distractions. *See* Def's Exh. G. at 087, 088, 090 (listing three such examples). Barhorst's supervisors never suggested any issue with how he documented, performed during, or counted his hours training with Roy. Doc. No. 47 at PageID 336–37.

Pollard's expert witness, Jerry Potter, is an experienced dog trainer who has trained dogs in narcotics and explosives detection for the military. *See* Def's Exh. J. He testified at the suppression hearing about what he perceived to be faults in Roy's training. Doc. No. 47 at PageID 349–50. Potter believed Barhorst and Roy did not meet OSHP's sixteen-hour training requirement because, after reviewing the training records, he thought Barhorst spent too much time setting up and tearing down the lures in each hour. Doc. No. 47 at PageID 379–80. Instead, Potter felt the duo should spend the entire hour running Roy through training exercises. Doc. No. 48 at PageID 403–04. Because of this, Potter thought Roy was unreliable. Doc. No. 47 at PageID 381–83; Doc. No. 48 at PageID 403–04. Potter also criticized how Barhorst and OSHP set up the lures, alleging that if Barhorst knew where the training aids were beforehand, this made Roy less accurate. Doc. No. 47 at PageID 383. Potter stated, however, that his opinion came from his review of OSHP's manual; the manual did not define what precisely must occur during "training." Doc. No. 48 at PageID 429–31. Potter further noted that OSHP approved Barhorst's training logs without criticism. *Id.* at PageID 431–32.

Potter also took aim at Roy's alert. First, Potter implied that by taking Roy back to sniff the car twice, Barhorst did not believe Roy accurately alerted. Doc. No. 48 at PageID 412–13.

6

Based on his experience as a dog trainer, Potter pointed out that after Roy scratched (alerted) on the Cadillac, he failed to resist leaving without receiving his toy. Doc. No. 47 at PageID 379–81. Potter implied this was suspect. Doc. No. 48 at PageID 414–15. In his view, dogs should not leave without receiving their toy if they are trained to alert in anticipation of their toy. *Id.* By doing so, according to Potter, Roy did not expect to get his toy—which meant that Roy did not smell narcotics. *Id.*

Upon cross-examination, Potter acknowledged that he never assisted or trained dogs with OSHP or OPOTA, so he was unfamiliar with their training methodologies. Doc. No. 47 at PageID 358, 425–28. Nor was he familiar with Roy or his baseline behavior. Doc. No. 48 at PageID 425–26, 436. Likewise, Potter never spoke to Barhorst's supervisors, who approved the reports, about Roy's training. *Id.* at PageID 430–32. He further stated that there is no national standard for dog training. Doc. No. 47 at PageID 372–75; Doc. No. 48 at PageID 424. Instead, each organization has their own certification standard. Doc. No. 47 at PageID 373–75. Finally, Potter said it would be difficult to reward Roy with a toy on a busy highway. Doc. No. 48 at PageID 435.

## II.

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The Fourth Amendment protects individuals against unreasonable searches and seizures." *United States v. Bateman*, 945 F.3d 997, 1005 (6th Cir. 2019) (citations omitted) (quotation marks omitted). While the Fourth Amendment "is silent as to the remedy afforded one whose property is searched or seized subject to a warrant lacking probable cause . . . the 'principal judicial remedy' for Fourth Amendment violations" is the exclusionary rule, which "bars courts from allowing unlawfully seized evidence to be used in

a criminal trial[.]" *United States v. Elmore*, 18 F.4th 193, 199 (6th Cir. 2021) (citation omitted) (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)).

A defendant may file a pretrial motion asserting a Fourth Amendment violation and seeking suppression of unlawfully seized evidence. *See* Fed. R. Crim. P. 12(b)(3)(C). Defendants carry the burden to show "a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman,* 606 F.2d 673, 679 n.11 (6th Cir. 1979)).

### III.

Pollard's post-hearing brief revolves around the stop-and-sniff. Thus, this case asks three questions: (1) Did Trooper Duteil have probable cause to pull Pollard over; (2) Did the police have reasonable suspicion to deploy Roy; and (3) Was Roy's alert reliable enough to establish probable cause? The answer to all three inquiries is "yes." Trooper Duteil observed Pollard commit two traffic infractions; the informant's tip coupled with Pollard's behavior triggered reasonable suspicion to have Roy sniff the Cadillac; and—Pollard's expert's testimony notwithstanding—Roy was certified, trained, and reliable.

**A. The Traffic Stop**

An officer may conduct a traffic stop "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment." *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (quoting *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996)). "Probable cause to conduct a traffic stop is conferred where . . . an officer observes a motorist violate a traffic law." *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (citing *United States v. Bell*, 555 F.3d 535 (6th Cir. 2009)). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'"

8

under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1986). "Whether that seizure is reasonable, however, does not depend on 'the actual motivations of the individual officers involved.' Rather, the reasonableness of the stop is contingent only upon whether 'the police have probable cause to believe that a traffic violation has occurred.'" *United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022) (citations omitted) (quoting *Whren*, at 810, 813).

Trooper Duteil had probable cause to believe Pollard committed two traffic violations: (1) a marked lane violation and (2) speeding. "Ohio law requires that a vehicle 'shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane . . . until the driver has first ascertained that such movement can be made with safety.'" *United States v. Warfield*, 727 F. App'x 182, 186 (6th Cir. 2018) (quoting Ohio Rev. Code Ann. § 4511.33). Trooper Duteil witnessed Pollard drive over the line for a few seconds. Doc. No. 47 at PageID 183, 220; *cf. State v. Mays*, 894 N.E.2d 1204, 1210 (Ohio 2008) (finding that where an officer observed the defendant cross the highway's white edge line, the officer had probable cause to initiate a traffic stop); *United States v. Ordaz*, No. 3:20-cr-42, 2020 WL 5810099, at *3–4 (S.D. Ohio Sept. 30, 2020) (same). His testimony was uncontroverted, despite it being out of view of the dashboard camera, so this alone established probable cause for the stop. *See, e.g.*, Doc. No. 47 at PageID 182 (noting that Duteil could see angles that were not fully shown in the video footage); *United States v. Pedicini*, 804 F. App'x 351, 353–54 (6th Cir. 2020) (officer's credible testimony showed that there was probable cause for a traffic stop where dashboard camera did not show officer's full field of view).

The Court also credits Trooper Duteil's testimony that, for five seconds, he paced Pollard traveling seventy-two-mph in a sixty-five-mph zone. Doc. No. 47 at PageID 181, 216; *see, e.g.*, *United States v. Carter*, No. 1:14-cr-194-1, 2015 WL 13037479, at *2 (N.D. Ohio Jan. 26, 2015)

9

("Driving over the speed limit is a traffic violation in Ohio and provides an officer with probable cause to stop a vehicle" (citing *United States v. Wellman*, 185 F.3d 651, 655–56 (6th Cir. 1999))). This establishes probable cause to pull him over for speeding—another sufficient justification. *See, e.g.*, Doc. No. 47 at PageID 181, 213–14 (stating that Duteil's speedometer was calibrated); *United States v. Letourneau*, 944 F. Supp. 619, 622–23 (N.D. Ohio 1996) (crediting officer's testimony that he determined the defendant's speed through pacing using his "calibrated speedometer"). While the video footage did not show Pollard's speeding in its entirety, the footage—coupled with Trooper Duteil's testimony—"reveal[ed] what appear[ed] to be some pacing." *United States v. Carter*, 662 F. App'x 342, 346–47 (6th Cir. 2016) (finding district court did not err in concluding that defendant was speeding based on police officer's testimony and imprecise video footage); *see* Doc. No. 47 at PageID 181, 216; Def's Exh. E at 16:50:47–:56.[5]

Nonetheless, the police need more to extend a traffic stop beyond its original purpose to investigate a traffic violation. *See Lott*, 954 F.3d at 923. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). The police can extend the stop "if 'something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot.'" *Lott*, 954 F.3d at 923 (emphasis in original) (quoting *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012)). Thus, an officer may conduct "inquiries incident to [the traffic] stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the

---

[5] While Pollard objects to how long and far Trooper Duteil paced his vehicle, there is no set time or distance in which an officer must pace a traffic offender to calculate his speed. *Compare State v. Lumbus*, 59 N.E.3d 580, 586 (Ohio Ct. App. 2016) (finding one mile was a sufficient distance), *with State v. Woods*, 982 N.E.2d 1305, 1311 (Ohio Ct. App. 2012) (finding two blocks was an insufficient distance). As shown above, Duteil's credible testimony establishes Pollard's speeding. *See Carter*, 662 F. App'x at 346–47.

10

automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 355 (2016) (quoting *Caballes*, 543 U.S. at 408). By contrast, "[a] dog sniff, safety measures taken to facilitate a different investigation, and unrelated questioning, for example, are not tasks incident to the initial stop[,]" *Lott*, 954 F.3d at 924 (citing *Rodriguez*, 575 U.S. at 355–57), and an officer may not conduct a dog sniff "absent independent reasonable suspicion," *id; see also United States v. Salas*, 820 F. App'x 405, 412 (6th Cir. 2020).

Trooper Duteil had such suspicion. The tip warned that Pollard was smuggling drugs, and agents saw him place a package in his trunk while exiting the hotel the morning of the stop. *See* Def's Exhs. B, C; Doc. No. 47 at PageID 189, 212; *see also, e.g.*, *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) ("[T]he officer's reasonable suspicion need not arise exclusively from his own direct observations. Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers" (citing *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006))). This tip was corroborated because it asserted that Pollard would be driving the white Cadillac, and Trooper Duteil confirmed this. *See, e.g.*, *United States v. Keeling*, 783 F. App'x 517, 522 (6th Cir. 2019) (anonymous tip from confidential informant was corroborated for reasonable suspicion purposes when the tip matched the color and make of car the defendant drove). When coupled with Pollard's leap out of his Cadillac and his "overly nervous and defensive" behavior, these circumstances amounted to reasonable suspicion independent of the original grounds (speeding and marked lane violation) for stopping Pollard. Def's Exh. A; Def's Exh. E at 16:52:59–:54:01; *see Salas*, 820 F. App'x at 412–13 (finding reasonable suspicion existed for dog sniff because a confidential informant alerted the police that the driver was transporting drugs and driver was nervous in response to questioning); *Keeling*, 783 F. App'x at 522–23; *cf. Alabama v.*

11

*White*, 496 U.S. 325, 330 (1983) (noting an unverified tip from a known informant could establish reasonable suspicion). The Court turns next to Potter's testimony.

### B. Potter's Testimony

While the Federal Rules of Evidence do not apply in suppression hearings, Fed. R. Evid. 104(a), "a trial court's findings must be supported 'by competent and credible evidence,'" *United States v. Stepp*, 680 F.3d 651, 669 (6th Cir. 2012) (quoting *Fields v. Bagley*, 275 F.3d 478, 485 n.5 (6th Cir. 2001)). The Sixth Circuit has indicated that a district court is not bound by *Daubert* in suppression hearings but cautioned that "[e]ven at a suppression hearing, the district court must always consider any proffered expert's qualifications and determine, in its discretion, what weight to afford that expert's testimony." *Id.* (citing *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)); *cf. Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in . . . a bench trial").

Potter's testimony meets this threshold. As there is no national standard for drug-sniffing dog training, Potter's combination of experience and history of working with drug-sniffing dogs sufficiently shows he is qualified to testify as an expert. *See* Doc. No. 47 at PageID 372–75; Def's Exh. J. The Court will consider his testimony in ascertaining Roy's reliability. *See Stepp*, 680 F.3d at 669–70.

### C. Roy's Reliability

"If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 246–47 (2013); *see also United States v. Stubblefield*, 682 F.3d 502, 506 (6th Cir. 2012) ("A dog's training and reliability can be established by the testimony of the dog's handler alone" (citing *United States v. Diaz*, 25 F.3d 392, 396 (6th Cir. 1994))).

> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings.

*Harris*, 568 U.S. at 247. Essentially, testimony of the dog's certification and training can establish the dog's reliability. *United States v. Patton*, 517 F. App'x 400, 402–03 (6th Cir. 2013). "[E]xpert testimony offered to disprove the reliability of drug dogs generally [has] little value when determining the reliability of a particular drug dog." *United States v. Howard*, 621 F.3d 433, 449 (6th Cir. 2010). Ultimately, a dog's alert is reliable if "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.

It is undisputed that OPOTA, a bona fide organization, certified Roy, *see* Gov't's Exh. 3, and that OSHP approved Roy and Barhorst's sixteen-hour training requirement in the month before the search, Doc. No. 47 at PageID 261–62. Thus, the Court presumes Roy was reliable. *See Harris*, 568 U.S. at 246–47. Considering this, Pollard must show that Roy's certification or training was flawed—two herculean tasks, considering Roy's flawless training record and Potter's unfamiliarity with how Roy behaved or was trained. *See* Def's Exh. G; Doc. No. 47 at PageID 261–62, 336–37; *see also United States v. Ligon*, 861 F. App'x 612, 621 (6th Cir. 2021) (OPOTA-certified dog was reliable); *United States v. Davidoff*, 46 F. Supp. 3d 744, 753–54 (N.D. Ohio 2014) (dog that completed sixteen-hour monthly training requirement was reliable). Pollard cannot do either for two reasons.

First, Potter is unfamiliar with OSHP or how it measures "training" for the sixteen-hour requirement. Doc. No. 48 at PageID 429–31; *see, e.g.*, *United States v. Ferguson*, No. 3:20-cr-

13

018, 2021 WL 4848046, at *5–6 (S.D. Ohio Oct. 18, 2021) (rejecting Potter's testimony on reliability of dog sniff where he acknowledged that he was unfamiliar with the police department's dog training). Even though Potter would have set things up differently, he acknowledged that dog training and certification programs can have different standards. Doc. No. 47 at PageID 372–75; Doc. No. 48 at PageID 424. He also agreed that Roy and Barhorst met OPOTA's and OSHP's standards. Doc. No. 48 at PageID 430–31; *see also, e.g.*, *United States v. Bentley*, 795 F.3d 630, 636–37 (7th Cir. 2020) (where expert "conceded there are no national standards" to judge dog's training, dog's consistent record of finding narcotics in training sessions made it reliable). Therefore, his testimony—casting doubt on how OSHP sets up its training exercises and alleging that OSHP was "systematically not meeting their own standard" by signing off on Barhorst's training records—proves unhelpful. Doc. No. 48 at PageID 466–67; *see also* Def's Exh. G; *cf. United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008) ("While the defendant's expert witness may have developed a more accurate training protocol, the law does not endorse his prescriptions"). Rather, OPOTA's certification and training scheme proved Roy's reliability "in a controlled setting" when it verified Roy's ability to find hidden narcotics in many scenarios. *Harris*, 568 U.S. at 246–47; Doc. No. 47 at PageID 372–75; Doc. No. 48 at PageID 424. *Compare* Def's Exh. G (Roy's perfect training record), *with Stubblefield*, 682 F.3d at 506–07 (affirming denial of motion to suppress where dog's success rate was 90%).

Second, Potter's unfamiliarity with Roy further undermines his assertions. Potter never examined Roy, never trained with Roy, and does not know his baseline behavior. Doc. No. 48 at PageID 358, 425–26, 431–32. His speculation about how Roy ought to react is, therefore,

14

unhelpful for this independent reason. *See, e.g.*, *Howard*, 621 F.3d at 449; *Diaz*, 25 F.3d at 395.[6] That Barhorst only gave Roy—a dog trained to receive his toy *or* praise *or* play after alerting—praise without playing fetch near a highway where most vehicles travel over sixty-five-mph simply shows prudent judgment, rather than making Roy's alert unreliable. Doc. No. 47 at PageID 337–38; *cf. Diaz*, 25 F.3d at 395 (trained and certified dog was reliable notwithstanding expert's testimony that biting and barking were signs of frustration at not being able to detect an odor).

Roy was certified through OPOTA, a legitimate organization, and completed his training requirement. Def's Exh. G; Gov't's Exh. 3; *see Ligon*, 861 F. App'x at 821; *Davidoff*, 46 F. Supp. 3d at 753–54. He found narcotics in a plethora of scenarios with multiple distractions. *See* Def's Exh. G. Potter's testimony did not undercut Roy's reliability. *See Harris*, 568 U.S. at 246–47. "[T]he facts surrounding [Roy]'s alert . . . would make a reasonably prudent person think that a search [of the Cadillac] would reveal contraband or evidence of a crime." *Id.* at 248. The resulting search was, therefore, lawful because it was based on probable cause. *See Whitley*, 34 F.4th at 535–36.

### IV.

Based on the foregoing reasons, Pollard's motion to suppress is **DENIED**.

**IT IS SO ORDERED.**

Date: June 30, 2022                         s/Michael J. Newman
                                                                     Hon. Michael J. Newman
                                                                     United States District Judge

---

[6] Defendant's Exhibit H, a video showing a dog refusing to move without receiving its toy after altering, is also unhelpful for the reasons stated. *See Howard*, 621 F.3d at 449. It has no relevance on how Roy, a particular dog with his own unique characteristics, ought to react when he positively alerts. *Id.*